**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOHONO O'ODHAM NATION,<br>Office of the Attorney General<br>BIA Compound, Building 2<br>Sells, AZ 85634,<br><br>                    Plaintiff,<br><br>    v.<br><br><br>PRISCILLA WHITETHORNE,<br>Acting Director<br>Tucson Area Office, Indian Health Service<br>7900 S J Stock Road<br>Tucson, AZ 85746,<br><br>        and<br><br>SYLVIA MATHEWS BURWELL,<br>Secretary, U.S. Department of Health<br> & Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201,<br><br>        and<br><br>UNITED STATES OF AMERICA,<br><br>                    Defendants.<br>_____ | Case No.: _____ |

**COMPLAINT**

The Tohono O'odham Nation ("Nation") complains and alleges as follows:

## I.  INTRODUCTION

1.      This is an action for injunctive relief to force the award of a proposed contract

amendment between the Tohono O'odham Nation and the U.S. Indian Health Service (IHS)

under the special remedial provisions established in 25 U.S.C. § 450m-1 of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450 et seq. (ISDA).

2.     The Nation currently contracts with IHS to operate approximately 13% of the programs, services, functions and activities carried out by the IHS Sells Service Unit benefiting the Nation's reservation community west of Tucson, Arizona.  In 2013, the Nation proposed a contract amendment to operate the corresponding programs of the Tucson Area Office and IHS Headquarters office that are supportive of the service unit programs already under contract to the Nation.  IHS agreed to contract with the Nation to operate these Area Office and Headquarters programs, but the Defendant declined to award the Nation the full Area Office program funding amount the Nation was entitled to under the law.

3.     The Nation alleges that the Defendant's action violates the ISDA because it fails to provide the full amount the Secretary would have "otherwise provided" the Nation in her direct operation of the subject Area Office programs (25 U.S.C. § 450j-1(a)(1))—an amount which the agency measured in 2010 for the precise purpose of determining the Nation's actual share of Area Office programs.  The Nation seeks an injunction to overturn the Defendant's unlawful partial declination of the Nation's contract proposal, and an order awarding the contract amendment as proposed.

## II.  JURISDICTION

4.     This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1331, 1362; and 25 U.S.C. § 450m-1(a) of the ISDA.

5.      Whenever the Secretary declines to enter into a self-determination contract proposed by a Tribe, the Tribe has a right to initiate an immediate action in federal district court without further exhausting any administrative appeal procedures.  25 U.S.C. § 450f(b)(3).

## III.  PARTIES

6.      The Tohono O'odham Nation is a federally-recognized Indian Tribe with its tribal headquarters in Sells, Arizona.  The Nation is a "Tribe" as that term is defined by the Indian Self-Determination Act at 25 U.S.C. § 450b(e).

7.      The Tohono O'odham Nation, formerly known as the Papago Tribe, is one of four federally recognized Tribes of O'odham peoples who at one time occupied a vast area across present day Arizona, southern California and Mexico.  The Nation's present-day Reservation is located west of Tucson, and is roughly the size of Connecticut, with smaller tracts in Florence Village, San Xavier and San Lucy.  The largest community on the Reservation is Sells, Arizona, the seat of the tribal government, with approximately 11 other communities spread out across an extremely rural desert and mountainous area.  Tribal members speak a dialect of the O'odham language, which derives from the Uto-Aztecan language group.

8.      Priscilla Whitethorne is the Acting Area Director of the IHS Tucson Area Office ("Area Director").  Ms. Whitethorne exercises authority delegated to her by the Secretary of the U.S. Department of Health and Human Services, through the Director of the U.S. Indian Health Service, to carry out the Secretary's responsibilities under the ISDA and other applicable law.  As used throughout this Complaint (and unless context commands otherwise), the terms "Secretary," "HHS," "Director," "Area Director" and "IHS" are used interchangeably.

## IV.  FACTS AND GENERAL ALLEGATIONS

### A.  The Tohono O'odham Nation's Existing Indian Self-Determination Act Contract.

9.     The Tohono O'odham Nation operates various federal health care programs, functions, services, and activities of the Sells Service Unit (an administrative component of the IHS Tucson Area Office) pursuant to Contract No. HHSI249200400001C.   The foregoing Contract was awarded by IHS to the Nation pursuant to Title I of the ISDA (25 U.S.C. §§ 450—450n), and it expressly incorporates Title I into its terms.

10.     Under the foregoing Contract the Nation operates various behavioral health, substance abuse, community health, and AIDS/HIV programs (among others).   The Nation operates approximately 13% of the Sells Service Unit, and IHS operates the remainder of the Service Unit for the benefit of the Nation and other eligible Indian patients.

11.     The foregoing Contract is a "Self-Determination Contract" intended to "transfer the funding and the following related functions, services, activities, and programs . . . (or portions thereof), that are otherwise contractible under section 102(a) of such Act, including all related administrative functions, from the Federal Government to the Contractor[.]"

### B.  The Indian Self-Determination Act.

12.     The ISDA contemplates that an Indian Tribe may contract to operate IHS programs that are carried out at agency levels located above the local Service Unit level, including Area Office functions and Headquarters functions. Section 102(a)(1) of the ISDA, § 450f(a)(1), so provides:

> The programs, functions, services, or activities that are contracted under this paragraph shall include administrative functions of . . . the Department of Health and Human Services . . . that support the delivery of services to Indians, including those administrative activities supportive of, but not included as part of, the service

delivery programs described in this paragraph that are otherwise contractable.  <u>The administrative functions referred to in the preceding sentence shall be contractable without regard to the organizational level within the Department that carries out such functions</u>.  [emphasis added]

13.    A Tribe's contractable share of an IHS Area Office or of IHS Headquarters is called a "Tribal Share" of that office.  IHS Manual § 6-3.1(E)(15).  A Tribe has a right under § 450f(a)(1) to contract for the operation of its Area Tribal Shares and its Headquarters Tribal Shares.

14.    When a tribal organization submits a proposal to amend an existing self-determination contract (including an amendment to contract for the operation of that Tribe's "Area Tribal Shares"), within ninety days of receiving the proposed contract amendment the Secretary must "approve the proposal and award the contract unless the Secretary provides written notification . . . that contains a specific finding:

> that <u>clearly demonstrates</u> that, or that is supported by a controlling legal authority that—
>
> (A)    the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;
>
> (B)    adequate protection of trust resources is not assured;
>
> (C)    the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;
>
> (D)    <u>the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under</u> section <u>450j-1(a) of this title</u>; or
>
> (E)    the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope [of the programs, services, functions and activities

> covered by the Act] because the proposal includes activities
> that cannot lawfully be carried out by the contractor.

§ 450f(a)(2) (emphasis added).

15.     The foregoing subparagraph (D) of § 450f(a)(2) refers to the "applicable funding level" for an ISDA contract, as determined under § 450j-1.  That section, in turn, dictates the amount of direct program funding a Tribe shall receive when operating any contractable program:

> The amount of funds provided under the terms of self-determination contracts entered into pursuant to this subchapter shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract, without regard to any organizational level within the . . . the Department of Health and Human Services, as appropriate, at which the program, function, service, or activity or portion thereof, including supportive administrative functions that are otherwise contractable, is operated.

§ 450j-1(a)(1).  This funding amount is routinely called the "Secretarial amount," and is "the amount the Secretary would have expended had the government itself [continued to] run the program."  Arctic Slope Native Ass'n, v. Sebelius, 629 F.3d 1296, 1298–99 (Fed. Cir. 2010), vacated on other grounds 133 S. Ct. 22 (2012); on remand Arctic Slope Native Ass'n v. Sebelius, 501 Fed. Appx. 957 (Fed. Cir. 2012).  "The clearest meaning of [the] term 'would have otherwise provided' in the context of the Act is what the IHS would have otherwise spent on the program."  Pyramid Lake Paiute Tribe v. Burwell, Case No. 1:13-cv-01771-CRC, Docket 26 (Mem. Op.) at 13 (D.D.C. Oct. 7, 2014).

**C. The History of the Tucson Area Office and the Ongoing Dispute Over Tribal Shares.**

16.     In 1967, IHS opened the "Health Program Systems Center" in Tucson.  The Center was supported by the Phoenix Area Office, and was created to develop planning and budgeting procedures that would improve IHS's health care delivery systems.  Eventually, the Center became known as the Office of Health Program Research and Development.

17.     The Sells Service Unit is an administrative unit of the Indian Health Service.  IHS provides direct patient care in the Sells Service Unit through a 14-bed hospital located in Sells, Arizona, and three outpatient clinics located outside Sells on the Tohono O'odham Nation Reservation.

18.     When the Center opened, the Sells Service Unit served only the Tohono O'odham Nation.

19.     In 1968, through Tribal Council Resolution No. 14-68, the Nation (then known as the Papago Tribe) accepted IHS's proposal to integrate the Sells Service Unit into the Center, thereby agreeing to become a test site for systems to be developed at the Center.

20.     In 1978, the Pascua Yaqui Tribe (PYT) was officially recognized by the federal government as an Indian Tribe.  Pub. L. 95-375 (Sep. 18, 1978), codified at 25 U.S.C. § 1300f, et seq.  The Yaqui people in Arizona originate from Mexico and migrated into the Southwest following decades of conflict with the Mexican government.  In 1964, the federal government had conveyed to PYT 202 acres in Tucson adjacent to the eastern portion of the Tohono O'odham Nation Reservation.  Private L. 88-350 (Oct. 8, 1964), 78 Stat. 1196.

21.     Once Congress recognized PYT as an Indian Tribe, PYT members became eligible to receive health services from IHS.  PYT then opted out of the traditional IHS health

care delivery system and agreed with IHS that IHS would contract out the provision of medical care for PYT members to El Rio Health Center, a pre-paid health maintenance organization (HMO) administering a defined benefit plan.  See 42 U.S.C. § 2001(b) (authorizing Secretary to provide health services, with the consent of the Indian people served, through contracts with private or non-Federal health agencies).  The defined benefit package included the full range of ambulatory services, in-patient services at a local non-IHS hospital, specialty referral services and catastrophic health services.  Since that time, Congress has continuously funded the PYT-IHS arrangement through congressional earmarks contained in the IHS contract health services (CHS) appropriation.[1]

22.     On March 1, 1997, the Office of Health Program Research and Development became the Tucson Area Office.  61 Fed. Reg. 67052 (Dec. 19, 1996).  The Tucson Area Office only serves two Tribes: the Tohono O'odham Nation and PYT.

23.     In 1997 or 1998, IHS Senior Operations Research Analyst Cliff Wiggins conducted an extensive analysis of the Level of Need Funded status of PYT.  Mr. Wiggins found the level of medical needs that IHS was funding for PYT health care to be higher than almost every other Tribe in the United States.

24.     Although the Tucson Area Office administers the HMO contract with El Rio, when the original CHS earmark was made to fund that contract, no corresponding funds were

---

[1] Subsequent to most of the events giving rise to this litigation, Congress in January 2014 renamed "Contract Health Services" as the "Purchased and Referred Care Program."  2014 Consolidated Appropriations Act, Pub. L. 113-46 (2014).  Since the relevant documents at issue in this case generally refer to the Contract Health Services (or CHS) program, this Complaint uses that older term as well.

provided to cover IHS's contract administration costs.  Thus, the Tucson Area Office diverted resources serving the Tohono O'odham Nation to cover its minimal contract administration costs associated with the El Rio HMO contract.

25.     Sometime before March 2010, PYT discussed with the Tucson Area Office PYT's interest in securing an ISDA contract to take over IHS's management of the El Rio HMO contract, together with PYT's associated Area Tribal Shares of the Tucson Area Office supporting the administration of the contract.  These discussions required IHS to assess the actual amount of the Tucson Area Office serving PYT.  The Area Office expected PYT's formal proposal to be submitted during the last week of April 2010.

26.     In late March and early April 2010, the Tucson Area Office conducted a comprehensive workload analysis of its operations.  The analysis surveyed all Tucson Area Office personnel to assess what portion of each person's time was spent performing Area Office functions serving each Tribe.  The survey was undertaken with the guidance of IHS Headquarters personnel, including IHS Senior Operations Research Analyst Cliff Wiggins.

27.     The Tucson Area Office workload analysis survey revealed that PYT was entitled to $35,575.70 of Area Office program funding.  According to agency documents later distributed to the Nation and PYT, this figure represented that, aside from time spent to perform inherently federal functions, approximately 98.8% of the Area's time was spent serving the Tohono O'odham Nation, and approximately 1.2% was spent serving PYT (primarily administering PYT's CHS contract).

28.     On information and belief, the Tucson Area Office workload analysis survey was undertaken three times.  Nothing in the analysis showed that its results were an aberration. The

agency accepted the result that awarded the highest amount ($35,575.70) to PYT as the official result of the workload analysis.  As noted above in para. 27, this amount equated to 1.2% of available Area Tribal Shares.

29.     In June 2010, PYT formally proposed an ISDA contract to operate the CHS program serving the Tribe (i.e., to administer the HMO contract with El Rio Health Center or to otherwise redesign those CHS-funded services).    PYT also proposed to contract to operate its Area Tribal Shares of the IHS Tucson Area Office (as well as its IHS Headquarters Tribal Shares).   Since the Tucson Area Office serves both PYT and the Nation, PYT's proposal required IHS to formally determine what portion of the Tucson Area Office was actually serving PYT.

30.     In its June 2010 proposal, PYT proposed a user population methodology to determine its portion of the Tucson Area Office.   Under the proposed user population methodology (based on 1996 data), PYT asserted its Area Tribal Share was 17.88% of all available Area Tribal Shares, and that the Tohono O'odham Nation's share was the remaining 82.12%.

31.     IHS refused to award this proposal, explaining in a letter dated July 7, 2010 from former Area Director George Bearpaw that the Tucson Area Office "utilized a comprehensive workload analysis to determine PYT TS [Tribal Shares] associated with the PYT CHS program" and the "TAO [Tucson Area Office] will not agree to any Tribal Shares amount that is not supported by the TAO's workload analysis of the level of effort and associated resources expended in support of the PYT's CHS [programs, services, functions and activities]."   In

negotiations with PYT in July 2010, the Tucson Area Office "explained that the workload analysis methodology of determining Tribal Shares is the most accurate and appropriate methodology."

32.     The agency explained further in a letter dated August 26, 2010 from George Bearpaw: "That [the workload] methodology and the results thereof, provide an accurate accounting of the level of effort and resources that the TAO expends in support of the subject PFSAs and conforms to the provisions of the ISDEAA at Section 106(a)(1) [§ 450j-1(a)(1)]." The agency explained that "An exact accounting of the Section 106(a)(1) [amount] using a workload methodology [i]nsures that the amount of funds to be provided with this contract proposal are not less than the Secretary would have provided."  Moreover, "[t]he [workload] methodology and resultant Tribal Share amount are not subject to negotiation simply because it is a precise accounting of the PYT's Tribal Shares; and deviation from this amount would either provide a lesser amount to the PYT than Section 106(a)(1) requires or would necessarily subtract funds allocable to another Tribe's [i.e., the Tohono O'odham Nation's] Tribal Shares which would violate the tenets of the ISDEAA and Section 106(a)(1)."

33.     In September 2010, TAO staff issued an internal email to other agency officials, explaining that it intended to decline PYT's contract proposal for Area Tribal Shares because the "Tucson Area [Office] was advised by the Director, Direct Services and Contracting Tribes, by OGC and vicariously, Mr. Wiggins, that the preferred methodology of determining Tribal Shares is by actual workload methodology, if the process can be undertaken and completed in a reasonable time frame."  Moreover, the email confirmed that "[d]ue to the size of the Tucson

Area [two (2) Tribes] and the nature of the PYT health delivery service Program (CHS), the Tucson Area was able to undertake and complete an actual workload analysis, in a very short time frame."

34.     On September 14, 2010, IHS began awarding Area Tribal Shares to PYT.  The agency used the workload analysis to determine the proper amount of PYT's Area Tribal Shares.

35.     Sometime before November 29, 2010, the Tohono O'odham Nation submitted a formal request to contract for its Tucson Area Office Tribal Shares related to the Nation's HIV-AIDS contracted program.

36.     By letter to IHS Director Yvette Roubideaux dated November 29, 2010, the Tohono O'odham Nation informed IHS that it objected to separate discussions with PYT that it learned were being conducted to discuss using the user population methodology instead of the actual workload methodology, and it advocated for adherence to the agency's workload analysis.

37.     The Nation was never informed that PYT had been awarded Area Tribal Shares.

38.     During 2010, 2011 and 2012, a series of meetings was held with the Tucson Area Office and members of both the Nation and PYT to discuss the methodology the Area Office would use to determine Tribal Shares on a going-forward basis.

39.     At an internal IHS meeting held on August 31, 2011, and directly contrary to the Area's Office prior position, then-Tucson Area Director George Bearpaw declared that the agency position on the allocation of Area Tribal Shares would thereafter be based on user population "[s]imply because that's the way funds have been distributed and is an acceptable method in IHS."  In an issue statement submitted to the IHS Director and Deputy Director on September 19, 2011, Mr. Bearpaw stated, incorrectly, that "The Tucson Area Office has used the

1996 user population percentage to distribute program funding since that time . . . Neither Tribe has opted to change this methodology since 1997 even though both Tribes have been given several opportunities for discussion."  On information and belief, this Area Office position was never communicated to either Tribe, was never implemented by the Area Office, and had never been the subject of discussion with the Tohono O'odham Nation other than as summarized in paragraph 38, supra.  At the time of these two statements, Mr. Bearpaw's wife worked for PYT.

40.     On information and belief, no agreement regarding the distribution of Area Tribal Shares was ever reached between the Tucson Area Office, PYT and the Nation.

**D.  The Tohono O'odham Nation's Tribal Shares Contract Proposal and IHS Response.**

41.     In August 2013, the Tohono O'odham Nation submitted a contract amendment proposal to IHS.  The amendment proposed contracting for the operation of those Area and Headquarters Tribal Shares that supported the various functions already under contract to the Nation.  The Nation's proposal assumed that its Area Tribal Shares totaled 98.8% of all contractable Area Office functions, as determined through the Tucson Area Office workload methodology.  Since the Nation only contracts for approximately 13% of the available IHS Service Unit programs serving the Nation, the Nation proposed to contract for 13% of its Area (and Headquarters) Tribal Shares.  In determining the Nation's Tribal Share of the Tucson Area Office, the Nation used the same agency workload methodology which the Tucson Area Office used in July and August 2010 to reject the PYT's insistence on a user population methodology.

42.     In the Nation's proposal, the Nation requested $563,808 in Area Tribal Shares.  In subsequent meetings with the Tucson Area Office, the Nation received updated information regarding the amount of the Area Office available for Tribes to contract.

43.     In the Nation's proposal, the Nation estimated certain amounts for contract support costs to support the Nation's administration of the requested Area Tribal Shares. <u>See</u> §§ 450j-1(a)(2)–(5).  During a January 8, 2014 negotiating session, the Nation and the Tucson Area Office agreed to table the issue of contract support costs, and to break off those issues for consideration separate and apart from the Nation's Tribal Shares proposal.

44.     On May 19, 2014, Area Director Whitethorne issued a partial declination of the Nation's contract proposal, stating that the Area now believes a "user population allocation methodology" to be more appropriate to distribute Tribal Shares.  The declination letter did not explain why the user population approach was more appropriate than the workload methodology.

45.     The May 19, 2014 declination letter did not address the reasons advanced in the Tucson Area Director's August 2010 correspondence to PYT for <u>rejecting</u> the user population methodology.  (<u>See</u> para. 32, <u>supra</u>.)

46.     The May 19, 2014 declination letter asserted that the determination of the Tohono O'odham Nation's appropriate tribal share was discretionary with the agency under <u>Lincoln v. Vigil</u>, 508 U.S. 182 (1993), and was therefore unreviewable.  (<u>But see</u> <u>Pyramid Lake Paiute Tribe v. Burwell</u>, Case No. 1:13-cv-01771-CRC, Docket 26 (Mem. Op.) at 10-11 (D.D.C. Oct. 7, 2014) (rejecting IHS reliance on <u>Lincoln</u> as conferring discretion upon the agency over the setting of ISDA contract funding levels)).

47.     Since 2010, the Tucson Area Office never informed the Nation that the agency had adopted a user population methodology until the Area Director issued her May 19, 2014 partial declination letter.  On information and belief, from 2010 until 2014, IHS did not use the user population methodology to award Tucson Area Office Tribal Shares.

48.     In her May 19, 2014 letter, the Area Director asserted the Nation was only entitled to $259,031 in Area Tribal Shares (based upon 13% of 82.12% of total available Area Tribal Shares), rather than the amount generated by the workload methodology (based upon 13% of 98.8% of total available Area Tribal Shares).  The Area Director asserted that any amount above this level "exceeds the applicable funding level" the Nation is entitled to receive under § 450f(a)(2)(D).

49.     On May 27, 2014, the Area Director modified the Nation's funding agreement to add $366,488.  This award included $259,031 in Area Tribal Shares calculated by using the user population methodology, plus $107,457 in undisputed Headquarters Tribal Shares.

50.     On June 18, 2014, the Nation requested an informal conference to review the Director's decisions.

51.     On August 27, 2014, the informal conference was held in Sells, Arizona.

52.     On September 8, 2014, the IHS hearing officer issued a recommended decision to affirm the agency's partial declination.  This action followed.

## V.  FIRST CAUSE OF ACTION
### (Failure to Award Proposed Contract Amendment for Area Tribal Shares)

53.     The Tohono O'odham Nation incorporates into this First Cause of Action all previous allegations of fact and law set forth in this Complaint.

54.     On appeal to this Court the Area Director carries "the burden of proof to establish by clearly demonstrating the validity of the grounds for declining the contract proposal" the Nation submitted for the award of Area Tribal Shares based upon the workload methodology.  25 U.S.C. § 450f(d).

55.     The Defendant can only carry her burden of proof if she can clearly demonstrate the validity of her position that the award of the Tohono O'odham Nation's proposed Area Tribal Shares contract at the level dictated by the workload methodology would have exceeded the applicable funding level for the contract because it would have been in excess of the amount the Defendant would have otherwise provided and spent in her direct operation of the Area Office.

56.     The Secretary cannot carry the heavy burden of proof described in paragraphs 54 and 55.   The "applicable funding level" for the requested contract (§ 450f(a)(2)(D)) is the amount the Secretary would have "otherwise provided" in her direct operation of the Area Tribal Shares at issue here.   § 450j-1(a)(1).   This is the amount the Secretary would have actually spent for the Nation's benefit.   Pyramid Lake Paiute Tribe v. Burwell, Case No. 1:13-cv-01771-CRC, Docket 26 (Mem. Op.) at 13 (D.D.C. Oct. 7, 2014).

57.     The most accurate way to determine the applicable funding level for a Tribe's Area Tribal Share, i.e., the amount the Secretary would have "otherwise provided" for that Tribe when spending Area Office resources, is to undertake a workload analysis of the programs, services, functions, and activities actually being performed for that Tribe by that Area Office.

58.     The Tucson Area Office's workload analysis precisely determined the Tribal Shares of the Area Office allocable to each of the two Tribes served by the Area Office.   The workload analysis showed that the Tucson Area Office was actually spending at least 98.8% of its resources for the benefit of the Tohono O'odham Nation.

59.     The Tohono O'odham Nation proposed a contract amount for Area Tribal Shares which matched the Tucson Area Office's workload analysis.

60.     The Area Director's rejection of the Nation's proposed use of the Area Office's own workload methodology for the calculation of the Nation's Area Tribal Shares is unlawful and contrary to the controlling standard set forth in the ISDA for determining the applicable funding level of an ISDA contract.  §§ 450f(a)(2)(D); 450j-1(a)(1).

61.     The Area Director failed to make a specific finding that "clearly demonstrat[es] the validity of the grounds for declining the contract proposal" (§ 450f(e)(1)), by failing to support her decision that the workload methodology produces a funding level that is in excess of the amount the Secretary "would have otherwise provided" the Nation in her direct operation of the Area Office.   Such a finding would be in direct conflict with the Secretary's rejection of the PYT Tribe's proposal <u>not</u> to use the workload methodology for precisely the same purpose.

62.     The amount proposed by the Nation for its Area Tribal Share reflects the proper Secretarial amount because it is the actual amount the "Secretary would have otherwise provided for the operation of the programs or portions thereof," based on a detailed 2010 agency study of precisely this issue.  § 450j-1(a)(1).  The Nation's proposed amounts are based on the agency's own workload analysis which surveyed the quantity of resources the Area Office <u>actually</u> devotes to the Nation.  The workload analysis revealed that approximately 98.8% of all available Area Office Tribal Shares funding is devoted to programs, services, functions and activities serving the Nation.  By definition, the 98.8% share represents the precise amount the Secretary would otherwise provide for Area Office programs benefitting the Nation.  This Court recently reiterated that the Secretary must award the amounts the agency actually spends in operating the subject program (barring some aberration).  See <u>Pyramid Lake Paiute Tribe v. Burwell</u>, Case No. 1:13-cv-01771-CRC, Docket 26 (Mem. Op.) at 13 (D.D.C. Oct. 7, 2014) ("The Secretary's tribal share argument posits that what IHS 'would have otherwise provided' for a program is the amount it

allocated in its budget for a particular program, rather than what it would have actually spent. Neither the Act nor IHS's apparent practice supports the Secretary's interpretation.  The clearest meaning of [the] term 'would have otherwise provided' in the context of the Act is what the IHS would have otherwise *spent* on the program.").

63.    The unique history of the Tucson Area Office, including the fact that one of the two Tribes has historically been served through an HMO program operated by a private contractor that is funded mostly with CHS appropriations and which requires minimal Tucson Area Office supervision, while the other Tribe is served 100% by the Tucson Area Office, indicates that a workload analysis is the most appropriate method for determining the amount the Secretary would have otherwise provided for the Nation (as well as for the other Tribe) in the absence of a contract being awarded to either Tribe.

64.    In the absence of a lawful agency declination, the Secretary was required "to approve the proposal and award the contract" that the Nation submitted for its Area Tribal Shares, see § 450f(a)(2), and thereafter "to add to the contract the full amount of funds to which the contractor is entitled under § 450j-1(a)(1)]."  See § 450j-1(g).

65.    The ISDA provides a special statutory right to "immediate injunctive relief to reverse a declination finding under section 450f(a)(2) . . . or to compel the Secretary to award and fund an approved self-determination contract," and "to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under [the ISDA]."  § 450m-1(a).

66.    IHS's refusal to award the Nation's proposed contract amendment for Area Tribal Shares in the full amount requested, calculated based upon the workload methodology, is

contrary to law.  The Nation is entitled to immediate injunctive relief directing the Tucson Area Office to award a contract amendment for the Nation's Area Tribal Shares based upon the workload methodology, as the Nation proposed.

## VI. PRAYER FOR RELIEF

WHEREFORE, the Tohono O'odham Nation prays that this Court grant the following relief:

(a)     A declaration that Defendant's May 19, 2014 partial declination of the Nation's Area Tribal Shares proposal was unlawful under 25 U.S.C. § 450f(a)(2)(D)) and 25 U.S.C. § 450j-1(a)(1);

(b)     A declaration that Defendant has failed to carry her burden of proof on appeal to this Court to establish by clearly demonstrating the validity of the grounds she advanced in her May 19, 2014 letter decision for declining the Nation's proposed contract amendment.  25 U.S.C. § 450f(d);

(c)     An immediate injunction compelling IHS to enter into the contract amendment proposed by the Nation for Area Tribal Shares and to compel the immediate payment of the difference between the Nation's Area Tribal Shares amount calculated using the workload methodology and the $259,031 already awarded by the agency;

(d)     Costs and attorneys' fees incurred in pursuing these claims, including the appeal before this Court, as provided for under the Equal Access to Justice Act, 5 U.S.C. § 504; 5 U.S.C. § 552(a)(4)(E); 28 U.S.C. § 2412; 25 U.S.C. § 450m-1(c) and other applicable law; and

(e)     Such other monetary, declaratory and equitable relief as this Court may find to be just.

///

///

///

///

///

Respectfully submitted this 17th day of December 2014.

SONOSKY, CHAMBERS, SACHSE
ENDRESON & PERRY, LLP

*/s/ Lloyd B. Miller*

By: _____

Lloyd B. Miller
D.C. Bar No. 317131
AK Bar No. 7906040

1425 K Street, N.W., Suite 600
Washington, D.C. 20005
Telephone: (202) 682-0240
Facsimile: (202) 682-0249
E-mail: Lloyd@sonosky.net